UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Jaquinda Coleman,

                              Plaintiff,

                                                    **Hon. Hugh B. Scott**

                                                    09CV157S

                    v.

                                                    **Report &
                                                    Recommendation**
                                                    (Corrected)[1]

The City of Niagara Falls, et. al.,

                              Defendants.

_____

        Before the Court are the following motions: defendants' respective motions for summary

judgment (Docket Nos. 78 and 82) and defendant City of Niagara Falls' motion to strike certain

papers (Docket No. 95).


                              **Background**

        The plaintiff, Jaquinda Coleman ("Coleman") commenced this action pursuant to 42

U.S.C. §1983 alleging that her rights were violated in connection with her arrest on February 24,

2008.  The plaintiff's Second Amended Complaint names the following as defendants: The City

_____

        [1]  The Court has corrected a typographical error at page 25 of this Report &
Recommendation.

                              1

of Niagara Falls ("Niagara Falls"), Kenneth E. Redmond ("Redmond") and ten "John Does" whose identities are apparently unknown. (Docket No. 66).[2]  It is undisputed that on February 24, 2008, Coleman was arrested by Niagara Falls police officers.  Defendant Redmond, and other Niagara Falls police officers, responded to a domestic dispute involving Coleman's pregnant sister and her sister's boyfriend. (Docket No. 66 at ¶20).  The plaintiff claims that she inquired why her sister's boyfriend was not being arrested and told Redmond that she believed that he would have been arrested if the victim was a white woman. (Docket No. 66 at ¶ 21). Coleman alleges further dialog between her and Redmond took place in which he told Coleman that she would not "get far" in the system if she thought that way, and Coleman advised Redman that she was not interested in getting anywhere "in a White supremacist system." (Docket No. 66 at ¶¶ 22-23). According to the plaintiff, Redmond then told her to "go away or he would pepper spray her." (Docket No. 66 at ¶ 24).  Coleman asserts that after this exchange, Redmond walked away to another area of the parking lot, then walked toward her again, and without warning "ran up to [her] and discharged pepper spray into her face." (Docket No. 66 at ¶¶ 25-27). The plaintiff alleges that she then took off her glasses, at which time Redmond struck her on the head and body with his flashlight. (Docket No. 66 at ¶¶ 29-30).

According to Redmond, he responded to a call relating to domestic violence at 4600 Hyde Park Boulevard, Niagara Falls, New York , Apartment 125 . (Docket No. 105 at ¶ 8).[3]  Redmond

---

[2]  These same defendants were named in the plaintiff's initial complaint (Docket No. 1) and the First Amended Complaint (Docket No. 46).

[3]  The declaration of Defendant Redmond was originally filed as part of Redmond's motion papers (Docket No. 82-1).  However, it appears that the first several pages of the declaration were omitted from the electronic filing. A paper copy of the entire declaration was provided to the Court (and presumably the plaintiff) at the time of the filing. So that the record

stated that when he arrived he observed several "hysterical" individuals outside of the building saying that someone had "tried to kill a pregnant woman." (Docket No. 105 at ¶ 10). Redmond alleges that he proceeded to Apartment 125 and observed that another police officer, Kevin Henderson, was already on the scene. Redmond's subsequent report reflects that he observed a pregnant woman, later determined to be Lasheda Perry ("Perry"), on the floor moaning in pain, and that paramedics were already there caring for her. At that time, the pregnant woman stated "Steve and I were arguing and he pushed my son and my son bumped into me on accident, Steven did nothing to me." (Docket No. 82-2, page 2).[4] Once he entered the apartment, he saw evidence of a disruption inside the apartment including, a turned over table, a microwave and broken dishes on the floor. Redmond stated that he also observed an individual later identified as Stephen Newkirk ("Newkirk"), who was bleeding from an apparent knife wound. (Docket No. 105 at ¶ 11). According to Redmond, he worked with Officer Henderson to investigate the alleged domestic offense. In the course of the investigation, Redmond stated that he encountered the plaintiff in the parking lot as he was looking for Cynthia Lidge ("Lidge"), allegedly one of the participants in the domestic offense. (Docket No. 105 at ¶ 13). Newkirk had told the officers that Lidge "cut him with a knife." (Docket No. 82-2 at page 2). Redmond asserts that as he looked for Lidge, Coleman confronted him and "verbally abused and disparaged" his work in connection with the investigation which the plaintiff allegedly "characterized as a general race-based failure on the part of 'white' police officers to arrest" Newkirk, who purportedly injured Perry,

---

was complete in this matter, the declaration was re-filed. (Docket No. 105).

[4] According to Redmond's report, the pregnant woman's son "approached the writer and confirmed her story stating that Steven did not "Beat her up." (Docket No. 82-2 at page 2).

3

Coleman's sister. (Docket No. 105 at ¶ 14).   Among other things, Coleman is alleged to have

called Redmond "a fucking racist pig and a Nazi," and that she stated:  "I'm no fucking dog, I

don't have to listen to you.  I only listen to God, you white supremacist;" and  "I am here to bring

the white folk down.  This is a white versus black thing, you cops are white supremacists

bringing us black folk down."  Coleman allegedly made several references to Rev. Al Sharpton

and that Rev. Sharpton would have Redmond's job.  Coleman purportedly said, "Go ahead,

please try to arrest me, see what happens. I aint going nowhere." (Docket No. 82-2 at page 2).

Redmond stated that Coleman's "verbal abuse and vulgarities" continued to the point that they

became harassing to him and disruptive to the general public, causing other residents to come out

of their apartments. (Docket No. 105 at ¶ 15). Redmond stated that he further determined that

Coleman's conduct obstructed his investigation of the underlying incident. (Docket No. 105 at ¶

16).   According to Redmond, he asked Coleman to stop yelling and to leave the vicinity as he

attempted to locate Lidge, but that Coleman refused to comply with his request, and instead,

"escalated her threatening behavior" toward him. (Docket No. 105 at ¶ 17).   After Coleman

allegedly continued to disregard Redmond's warnings and continued her disruptive behavior,

Redmond stated that he advised Coleman that she was being placed under arrest for disorderly

conduct and obstruction of governmental administration. (Docket No. 105 at ¶¶  18-20).

Redmond asserts that when he attempted to handcuff Coleman, she "physically resisted and

repelled" him, positioned herself in a fighting stance "by putting up her fists" and yelling at him,

"it's on, it's on." (Docket No. 105 at ¶ 21).[5]  Redmond stated that in response to Coleman's

---

[5]   Redmond stated that he is 5'9'' 185 pounds, and that he estimates that the plaintiff is
approximately 6'2", 225 pounds. (Docket No. 105 at ¶ 27).

alleged physical hostility, he discharged pepper spray in the vicinity of Coleman's face. (Docket No. 105 at ¶ 23). According to Redmond, the pepper spray "had no disabling impact" upon Coleman, who "continued to charge me and move toward me in a manner which I feared was intended to result in me being tackled at the waist and possibly having my firearm taken." (Docket No. 105 at ¶ 24). Redmond stated that his reaction, as he backed away, was to reach for a non-lethal weapon on his utility belt, which turned out to be his flashlight. (Docket No. 105 at ¶ 25). Redmond stated that he intended to strike Coleman in the shoulder region. (Docket No. 105 at ¶ 26). Redmond declared that as he attempted to strike Coleman, "she dipped downward" and instead of striking her shoulder, his flashlight "came into contact with her forehead" causing her to fall to the ground. (Docket No. 105 at ¶ 28). Redmond stated that he was then able to place Coleman under arrest. (Docket No. 105 at ¶31). The plaintiff was initially placed in the back of a patrol car. Coleman alleges that she began to experience an asthma attack and asked for someone to open a window so that she could get some air. According to the plaintiff, Redmond responded that "white supremacists do not give you air." (Docket No. 90-2 at page 84). Coleman was eventually taken from the scene to the Niagara Falls Memorial Medical Center by ambulance where she was diagnosed with a skull fracture and transient cerebrospinal fluid leakage and concussion requiring a 10-day hospital stay (Docket No. 90 at page 12 and medical records filed as Docket No. 90-15). Redmond stated that he eventually charged her with disorderly conduct, obstruction of governmental administration and resisting arrest. (Docket No. 105 at ¶ 31).

Coleman subsequently pled guilty to two counts of disorderly conduct admitting that she refused to comply with lawful orders of the police and that she used abusive language. (Docket No. 20-2 at page 9). During the plea colloquy, however, Coleman was expressly asked only

whether she "refused to comply with a lawful order of the police to disperse." (Docket No. 20-2 at page 9). The transcript of the plea colloquy reflects that Coleman was not asked whether she admitted attempting to tackle or strike Redmond.[6]

The Second Amended Complaint asserts the following claims:(1) excessive use of force [First Claim]; assault [Second Claim]; battery [Third Claim]; intentional infliction of emotional distress [Fourth Claim]; negligent infliction of emotional distress [Fifth Claim]; and negligent hiring and training by the City of Niagara Falls [Sixth Claim].

The defendants have filed respective motions for summary judgment (Docket Nos. 78 and 82). Niagara Falls also seeks to strike certain documents filed by the plaintiff. (Docket No. 95).

## Discussion

**Motion for Summary Judgment**

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. See Trans Port, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The Court must draw all reasonable inferences in favor of the non-moving party and grant summary judgment only if no reasonable trier of fact could find in favor of the non-moving party. See Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991); Howley v. Town of Stratford, 217 F.3d 141 (2nd Cir. 2000). However, the non-moving party must, "demonstrate to

_____

[6] The record reflects that Niagara Falls City Court Judge Robert Merino, who conducted the plea colloquy, noted that Coleman had already asserted a claim against the City and that "we all understand that this [proceeding] has no affect on that claim." (Docket No. 20-2 at page 8).

the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit

Information, Co., 970 F.2d 1110, 1112 (2d Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986)). A fact is material:

> when its resolution would "affect the outcome of the suit under the
> governing law" and a dispute about a material fact is genuine "if
> the evidence is such that a reasonable jury could return a verdict
> for the non-moving party."

General Electric Company v. New York State Department of Labor, 936 F.2d 1448, 1452 (2d

Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The non-

moving party must come forward with enough evidence to support a jury verdict . . . and the . . .

motion will not be defeated merely . . . on the basis of conjecture or surmise." Trans Sport, 964

F.2d at 188 (citing Bryant v. Maffucci, 923 F.2d at 982). If undisputed material facts are

properly placed before the court by the moving party, those facts will be deemed admitted, unless

they are properly controverted by the non-moving party." Glazer v. Formica Corp., 964 F.2d

149, 154 (2d Cir. 1992) (citing Dusanenko v. Maloney, 726 F.2d 82 (2d Cir. 1984). The Court's

responsibility in addressing a summary judgment motion is identifying factual issues, not

resolving them. See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir.

1990). However, summary judgment is appropriate "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co.,

Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2d Cir. 2000) (quoting Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**Excessive Force**

The defendants move for summary judgment with respect to the plaintiff's claim of excessive force. Redmond asserts that he is entitled to qualified immunity. (Docket No. 82 at ¶ 2; Docket No. 82-7 at page 12). Redmond also argues that the plaintiff's claim is implausible and that his use of force was reasonable. (Docket No. 82-7 at pages 6-11).

As discussed above, Redmond asserts that he acted reasonably at all times and that he used only the necessary force required to subdue Coleman after she refused to stop her verbal abuse, obstructing the investigation and then resisting arrest. In support of the instant motion for summary judgment, Redmond submits a declaration from Officer Henderson, who asserts that he witnessed the altercation between Coleman and Redmond. (Docket No. 82-4). Henderson confirms Redmond's statements regarding the observations at the scene. He states that after speaking with Perry, they determined that no charges were warranted with respect to the initial domestic violence complaint, but that they needed to locate Lidge who was suspected of assaulting Newkirk with a bat and a knife. (Docket No. 82-4). With respect to the altercation between Redmond and Colemen, Henderson states:

> 11. Officer Redmond and I left apartment no. 125 to look for Cynthia Lidge, but I returned to the apartment and left Officer Redmond to continue the search for her. While I was outside during this time, I saw a large black female making verbally challenging remarks towards us expressing her disapproval about our not arresting Steven Newkirk and looking for Cynthia Lidge. After returning to the apartment, I received a radio call from Officer Redmond asking for assistance with an individual he was having a problem with near the parking lot area outside of apartment no. 125.

> 12. I left apartment no.125 and came outside and at that time witnessed Officer Redmond being confronted by a large woman (approximately 6'2" and over 200 pounds) who was the same woman I had verbally confront us previously. I later learned this woman to be the plaintiff, Jaquinda Coleman.

13. The encounter between the plaintiff and Officer Redmond escalated from a verbal encounter to a physical confrontation wherein the plaintiff made aggressive, fighting movements towards Officer Redmond, including but not limited to, (1),forcibly resisting his attempts to bring her under custody for the purpose of being placed under arrest, (2), repelling the application of pepper spray to the vicinity of plaintiff's face, (3), making charging movements towards Officer Redmond in an attempt to force him away from her, and (4), forcing Officer Redmond to move backwards in a backpedaling manner as plaintiff continued to make charging movements towards him. During the encounter the plaintiff was loud and verbally abusive and exhibited a high degree of agitation and hostility.

14. I observed Officer Redmond's attempt to secure the plaintiff's compliance to come under his physical custody through the use of verbal commands and without the use of physical force before having to resort to the use of pepper pray and eventually the use of his flashlight for the purpose of attempting to strike the plaintiff's upper body/shoulder region as she (plaintiff) was charging toward him.

15. From my vantage point which was within 20 to 25 feet of the action occurring between the plaintiff and Officer Redmond, I observed Officer Redmond acting defensively. Having personally observed Officer Redmond's interactions with the plaintiff, I believe that he exercised the level of judgment in dealing with a hostile street encounter that I know to be reasonable and necessary based on the training I received at the Niagara County Police Academy and the in-service training on the use of force provided to me by the NFPD.

16. My personal observations of the incident that occurred on February 24, 2008, between the plaintiff and Officer Redmond can be summarized as follows: (i) the plaintiff's actions and conduct during the entire encounter with Officer Redmond were objectively hostile, combative and aggressive and compelled Officer Redmond to act in a justifiably defensive manner to protect himself and bring the plaintiff under control for the purpose of arresting her; and (ii) all of the actions I observed on the part of Officer Redmond were objectively reasonable and consistent with the training that I am familiar with relative to the use of physical force to protect himself from an imminent threat of bodily harm while attempting to effectuate a lawful arrest of the plaintiff.

(Docket No. 82-4 at ¶¶ 11-16).

While the plaintiff has admitted refusing to failing to comply with a lawful order to

disperse and to using abusive language (Docket No. 20-2 at page 49), Coleman[7] denies calling

Redmond any names (Docket No. 90-2 at page 75) and states that she was talking with her father

when Redmond "ran up" and pepper sprayed her. (Docket No. 90-2 at page 71). Coleman

testified at her deposition that after she was pepper sprayed, she was "flailing around" just trying

to see. (Docket No. 90-2 at page 72). She denies coming into contact with Redmond.

Subsequently, she says that she remembers "something hitting me and falling down and blacking

out." (Docket No. 90-2 at page 75).

The record also includes deposition testimony from several other witnesses. Michelle

Weyers, who lives in the same apartment complex at 4600 Hyde Park Boulevard, testified that

the incident between Redmond and Coleman occurred in front of the door to her apartment.

(Docket No. 90-4 at page 12). She stated that she was standing in the doorway about five feet

away from them. (Docket No. 90-4 at page 12). Weyers stated that Coleman was complaining

that the officers' failure to arrest Newkirk "was not right." She did not recall Coleman using

obscenities talking to Redmond. (Docket No. 90-4 at page 15, 18). According to Weyers, after

Coleman kept saying things like "this isn't right," Redmond responded as follows:

> He started to say if you don't calm down or if you don't keep it
> down, I am going to have to ask you to go in the house, or
> something along those lines. And then she proceeded to talk with
> her father a little off to the side and she was saying that this isn't
> right, something should be done, she was pregnant [referring to
> Perry], he put his hands on her. And then the police officer said I
> am not going to tell you again, you are going to go in the house or
> something, something along those lines and she said I know my

---

7   The plaintiff's deposition transcript reflects that she was referred to by the name "Saia
Hu-Keekui" at the time of the deposition. (Docket No. 90-2). Inasmuch as no request to modify
the caption has been made in this case, the Court will continue to refer to the plaintiff as
"Coleman."

rights, I am allowed – she was speaking with her father at that
time....

After Jaquinda kept speaking about this isn't right and she kept,
you know, stressing that fact and after – you know, she was kind of
loud, or her voice was elevated at this time, and he had – after
saying it a couple times to her, please keep it down – or, he was
like I am about to arrest you and she was like what are you going to
arrest me for – or, what are you going to arrest me for, I know my
rights, you can't arrest me for freedom of speech. ...

She was in front of him and he was, maybe, I guess a foot behind –
in front of her and he sprayed her and then he backed up because –
I don't know, because she was doing something and he sprayed her
again.

(Docket No. 90-4 at pages 16-20). Weyers was asked if Coleman was flailing her arms at all, she

responded: "No. No. No. No. ... She wasn't like waving her hands at him or anything like that.

I think she was doing something like this or trying to get it off of her." (Docket No. 90-4 at page

20). Weyers testified that after Coleman was pepper sprayed "two or three times," she thinks

Redmond said something like "come here" and it looked like Coleman "was walking towards his

voice" when Redmond struck her with the flashlight. (Docket No. 90-4 at pages 21-22). Weyers

testified that Coleman was not lunging at Redmond when he struck her. (Docket No. 90-4 at page

22).

Darryl Lamar Brewer testified that he was at his girlfriend's apartment in the same

apartment complex at the time of the underlying incident. (Docket No. 90-5 at page 12). He

testified that Coleman was "irate," and called Redmond "a white, racist pig." (Docket No. 90-5 at

page 15, 17). According to Brewer, Coleman was "charging" at Redmond when he pepper

11

sprayed.[8] He described the incident as follows:

> When I cam back from checking on my girlfriend's son ... I seen
> her [Coleman] charging him [Redmond] and that's when he maced
> her. When he maced her the first time, she said it did nothing to her
> and she wiped it off her face and the she charged him again. Then
> he took two steps back and hit her with the flashlight.

(Docket No. 90-5 at page 18).

Ebony Gandy, who also lived in the Hyde Park complex at the time of the February 24,

2008 incident (Docket No. 90-6 at page 4), testified that she did not observe the entire incident

because she was dealing with her son who was in the bath tub. (Docket No. 90-6 at page 6).

Gandy stated that she did see Redmond "mace" Coleman. (Docket No. 90-6 at page 10).  Gandy

testified that she did not see Coleman clench her fists, or attempt to tackle Redmond. (Docket

No. 90-6 at page 11).  According to Gandy, after she was sprayed, Coleman was "hunched over"

or "falling forward," but that the mace did not really seem to have an affect on her. (Docket No.

90-6 at page 12). Gandy testified that Coleman was still arguing with the officer and Redmond

was still telling her to leave. (Docket No. 90-6 at page 12).  Gandy stated:

> I think the officer – I honestly think he felt threatened because she
> – she's a tall, one. She's tall and he was kind of short. And just the
> way she hunched over, he just hit her like.

(Docket No. 90-6 at page 13). Gandy testified that Coleman was moving toward Redmond, either

intentionally or possibly stumbling after she got maced, when Redmond took two big steps

toward Coleman and struck her with the flashlight. (Docket No. 90-6 at pages 15, 18). Gandy

stated that she did not observe Coleman do anything endangering Redmond and that it did not

---

[8]   In his deposition, Brewer used the phrase "maced" instead of pepper spray. (Docket
No. 90-5 at page 18).  These terms are often used interchangeably.

appear to her that Coleman was lunging at Redmond. (Docket No. 90-6 at pages 20, 30). The record reflects that on March 31, 2008, Gandy gave a "supporting deposition" to the Niagara Falls Police which included the following statement regarding the February 24, 2008 incident:

> I was at home and I was looking out the second floor bedroom window with Darryl Brewer. There was a police officer at another apartment outside, This police officer was alone with a black female who was upset. I believe her name is Jaquinda. I know her children but not really her. The officer told her to leave the scene and she continued to have words with him. The officer told her to shut the fuck up and she told hm not to talk to her that way. she said something like I am not your wife or animal, do not talk to me that way. Her father or step-father was with her and trying to get her to leave the scene. He grabbed her around the waist but she pulled away from him. She took one step forward from pulling herself away. At this time the officer started to mace her. The female hunched over from being maced. The officer then took two big steps towards the female and hit her with a flashlight.

(Docket No. 90-6 at page 28).

Charles Perry, Coleman's father[9], testified that Coleman was asking Redmond why the did not arrest Newkirk and why he would question his grandson [Perry's son] without an adult being present. (Docket No. 90-7 at page 16). Charles Perry stated that he went to Coleman, grabbed her arm to lead her back to her apartment, telling her that she could not "win" the argument. According to Charles Perry:

> I grabbed her by the arm. I grabbed her by the arm and told her to come on, you can't win the argument here. I was taking her back to her apartment. So this officer, he just came running out of nowhere. He just started spraying mace like it was all right. Everybody got sprayed.

---

[9] It is not clear from the record whether Perry is Coleman's "father" or "step-father." The portion of Perry's deposition transcript in the record reflects that he refers to Coleman as his "daughter." (Docket No. 90-7 sat page 15).

(Docket No. 90-7 at page 17). Charles Perry testified that he was sprayed but not "that much." (Docket No. 90-7 at pages 17-18). He stated that he let Coleman's arm go and that Coleman was trying to find her way home because she could not see, "[a]nd the next thing I know, [Redmond] pulled out something and wacked her in the head. I looked at him and I told him – I said that wasn't even necessary." (Docket No. 90-7 at page 20, 22).

Portions of the deposition transcript of Lashanique Carson, Coleman's daughter, is also in the record. Lashanique Carson testified that he observed that his cousin, Danny, was being questioned by Redmond. (Docket No. 90-8 at page 10-11). At that time, Coleman "calmly and politely" told Redmond that the boy was a minor and that he shouldn't be questioned. (Docket No. 90-8 at pages 11-12). Lashanique Carson stated that at one point, Redmond told Coleman to "shoo," like she was a dog. (Docket No. 90-8 at page 12). Lashanique Carson stated that after Redmond told her mother to "shoo" she walked away toward Charles Perry. (Docket No. 90-8 at page 14). Lashanique Carson testified that she, and her sister, were about four and a half feet away from Coleman when Redmond took out his pepper spray and sprayed Coleman. According to Lashanique Carson, some of the spray went into her sister's eyes. (Docket No. 90-8 at pages 15-16). Lashanique Carson stated that Coleman just took off her glasses, wiped them off and started going home. Lashanique Carson testified that Redmond then "ran towards" Coleman and hit her in the head with the flashlight. (Docket No. 90-8 at page 19).

Desmonique Carson, another one of Coleman's daughter, was also deposed. She testified that she was at the scene during the underlying incident. According to Desmonique Carson, who was 12 or 13 at the time (Docket No. 90-9 at page 11), she went outside with her sisters Lashanique and Deahjanique. (Docket No. 90-9 at page 9).Desmonique testified that she heard

14

Redmond tell Coleman to "shoo." Desmonique recalled the incident as follows:

> I went outside and then I hear her, and the cop told her to shoo. I
> turned around. My mom was being pepper sprayed. And she had
> her hands on her face, trying – I don't know what she was trying to
> do. She had her hands on the face. Then the cop moved towards
> her and hit her with the light.

(Docket No. 90-9 at page 10).  Desmonique did not recall any other portions of the discussion

between Colemand and Redmond. (Docket No. 90-9 at page 12).  She recalled seeing her

grandfather, Charles Perry, during the incident, but she did not see him move away from his car.

(Docket No. 90-9 at page 13).  Desmonique testified that she was not hit by the spray, but that

her sister, Deahjanique, was closer to her mother. (Docket No. 90-9 at page 17).

At her deposition, Deahjanique Carson, another one of Coleman's daughters, stated that

she also was outside and observed the altercation between Coleman and Redmond. (Docket No.

90-10 at page 14).  Deahjanique Carson stated that although she does not generally recall the

content of the discussion between Coleman and Redmond, she does recall hearing Redmond tell

Coleman to "shoo." (Docket No. 90-10 at page 15).  According to Deahjanique Carson, at that

point Coleman started to walk away, Redmond "ran up" to Coleman and pepper sprayed her.

(Docket No. 90-10 at page 17).  Deahjanique Carson did not recall Charles Perry attempting to

pull Coleman away prior to her being pepper sprayed. (Docket No. 90-10 at pages 17-18).

Deahjanique testified that she was close enough to her mother that she also got hit by the pepper

spray. (Docket No. 90-10 at page 19).  Deahjanique Carson stated that Coleman had her hands on

her eyes and that Coleman was moving back and forth, "kind of falling." (Docket No. 90-10 at

page 20). Deahjanique Carson stated that Redmond then took the flashlight out of his belt and hit

Coleman on the head. (Docket No. 90-10 at page 21). She testified that it was about one minute

between the time Coleman was pepper sprayed and then hit with the flashlight. Deanjanique Carson does not recall anything being said by anyone during the interim. (Docket No. 90-10 at page 22).

As described above, there is a factual dispute as to what transpired between Coleman and Redmond leading up to the use of the pepper spray and Redmond striking Coleman with the flashlight. The testimony of Henderson and Brewer support Redmond's version; while the testimony of Weyers, Gandy, Charles Perry, Lashanique Carson, Desmonique Carson and Deahjanique Carson, at least to some degree, support the version of events asserted by Coleman. Redmond argues that the plaintiff's allegations as to the altercation are not plausible. However, it is not implausible that a police officer subjected to a continuing stream of verbal abuse might overreact and use more force than was necessary under the circumstances. Although there are some inconsistencies between the various witnesses' statements, it is not for the Court to assess the credibility of the witnesses upon a motion for summary judgment. The sworn testimony provided in this case is sufficient to create a question of fact as to whether the use of force by Redmond on February 24, 2008 was reasonable or necessary.

The fact that Coleman pled guilty to two counts of disorderly conduct is also not dispositive of the excessive force claim in this case. As noted above, during the plea colloquy, Coleman was expressly asked only whether she "refused to comply with a lawful order of the police to disperse" and whether she "used abusive language" (Docket No. 20-2 at page 9). The transcript of the plea colloquy reflects that Coleman was not asked whether she admitted resisting arrest or attempting to tackle or strike Redmond. Further, it has not been demonstrated that the admission of such conduct by Coleman was a necessary element to a finding of guilt on

the disorderly conduct charges.

Finally, Redmond argues that summary judgment is appropriate because he is entitled to qualified immunity (Docket No. 82 at page 12). When considering the assertion of qualified immunity, the Court must ask whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). The Court must analyze claims of excessive force arising in the context of an arrest under the Fourth Amendment's objective reasonableness test, paying "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U .S. 386, 394, 396 (1989). As discussed above, there are factual disputes as to the facts surrounding the plaintiff's arrest, and whether the level of force used by Redmond was necessary and reasonable under the circumstances. These factual issues preclude the dismissal of the plaintiff's claims based upon qualified immunity. McLaurin v. Falcone, 2007 WL 247728 (2d. Cir. 2007)(Because there are disputes of fact here as to whether McLaurin resisted arrest and whether the level of force used by the officers was necessary and reasonable, the District Court's grant of qualified immunity was premature); Kerman v. City of New York, 261 F.3d 229, 239 (2d Cir.2001) (reversing grant of judgment as a matter of law on excessive force claim because "the contrasting accounts ... present factual issues as to the degree of force actually employed and its reasonableness"); Robison v. Via, 821 F.2d 913, 924 (2d Cir.1987) ("[T]he parties have provided conflicting accounts as to whether [plaintiff or the police] initiated the use of force [and] how much force was used by each.... Resolution of credibility conflicts and the choice

17

between these conflicting versions are matters for the jury...").

Based on the above, in light of the existence of a material issue of fact relating to the necessity and reasonableness of the use of force in this case, Redmond's motion to for summary judgment with respect to the excessive force claim should be DENIED.

**Municipal Liability**

The plaintiff's claim against the City of Niagara Falls is based upon the allegations that the City failed to properly hire and train its police officers, including Redmond. (Docket No. 66 at ¶¶ 68-72).

The plaintiff cannot maintain a claim against Niagara Falls based on a theory of *respondeat superior*. To state a §1983 claim against a municipality, a plaintiff must allege that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-691 (1978). A policy, custom, or practice of the municipal entity may be inferred where "the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir.2004)(internal quotation marks omitted). In addition, a municipality may be held liable for the acts of a municipal official who possessed final policymaking authority with respect to the challenged conduct. See Jeffes v. Barnes, 208 F.3d 49, 57-58 (2d Cir.2000).

Niagara Falls has moved for summary judgment (Docket No. 78). In support of the motion, the City has submitted a report by Mark S. Dunston, Deputy Chief of Police of the

Ocenan Springs, Mississippi Police Department, who the defendants engaged as an expert on the use of force and Niagara Falls' policies, procedure and training regarding the use of force. (Docket No. 79 at ¶ 52 and Exhibit 15)(the "Dunston Report"). The City has also submitted a declaration from E. Bryan DalPorto outlining the Niagara Falls Police Department's policies, procedures and training regarding the use of force. (Docket No. 80)((the "DelPorto Declaration"). DelPorto states that policies and training practices of the Niagara Falls Police Department have been accredited by the New York State Department of Criminal Justice Services ("DCJS") and the New York State Law Enforcement Accreditation Council ("the Council") (Docket No. 80 at pages 5-8).

Coleman asserts that Niagara Falls failed to properly train its employees in the use of force continuum, and acquiesced in a custom and/or policy which allowed its officers to: (1) use pepper spray in the most minimal of confrontations with suspects or civilians; (2) use heavy flashlights, not issued by the police department, and on which they have not been trained, as impact weapons; (3) not fully and properly investigate deadly use of force resulting in serious and life threatening personal injuries to unarmed civilians; and (4) discriminate on the basis of race. (Docket No. 90 at pages 9-10). In response to the City's argument in the instant motion, that they had adequately trained police officers, such as Redmond, on the proper use of force, Coleman has submitted a press release from the website maintained by the New York State Attorney General's Office announcing that the Attorney General had reached an agreement with the City of Niagara Falls inn which the City agreed to develop new policies to govern police practices in response to claims of excessive force and police misconduct. (Docket No. 103-2). The plaintiff also submitted a Stipulated Consent Order executed by the Attorney General's

Office, and the City of Niagara Falls. (Docket No. 103-2) (the "Consent Order"). The Consent Order states that the Attorney General conducted an inquiry into the policies and practices of the Niagara Falls Police Department after receiving complaints, primarily from African American residents, relating to excessive use of force by Niagara Falls Police Officers. The Consent Order states: "Whereas, the complaints from primarily African-American residents allege and documents indicate that the NFPD has not implemented policies and procedures to adequately investigate and prevent excessive use of force, including by physical force, Taser instruments, and oleoresin capsicum spray ("OC Spray")[10]; and that some officers and supervisors failed to follow department protocols that did exist to ensure proper police practice, including regarding the use of force and citizen encounters and the filing of reports on use of force to ensure proper practices and accountability. (Docket No. 103-2 at page 4). The Consent Order acknowledged that, since the commencement of the Attorney General's investigation, the City had "implemented some changes and indicated its desire to continue to reform its police policies and procedure to ensure appropriate use of force in all instances... ." (Docket No. 103-2 at page 4). The Consent Order goes on to set forth state that the City shall engage in independent auditor to consult with the City regarding revisions to its policies and training protocols (Docket No. 103-2 at page 6), and sets forth various other provisions relating to the reporting and training regarding the use of excessive force. (Docket No. 103-2 at pages 7-21).

These documents were previously filed by the plaintiff in response to the instant motion as Docket No. 90-21 and are the subject of the City's motion to strike (Docket No. 95). Niagara Falls argues that the Consent Order and the press release, which was executed two years after the

---

[10]   OC Spray is also known as pepper spray.

incident underlying this action, are not admissible in evidence, and therefore, should be stricken

pursuant to Rule 408 of the Federal Rules of Evidence and not considered in connection with the

instant motion. (Docket No. 96 at page 2). Rule 408 provides:

> Evidence of the following is not admissible--on behalf of any
> party--either to prove or disprove the validity or amount of a
> disputed claim or to impeach by a prior inconsistent statement or a
> contradiction:
>
> (1) furnishing, promising, or offering--or accepting, promising to
> accept, or offering to accept--a valuable consideration in
> compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations
> about the claim--except when offered in a criminal case and when
> the negotiations related to a claim by a public office in the exercise
> of its regulatory, investigative, or enforcement authority.
>
> (b) Exceptions. The court may admit this evidence for another
> purpose, such as proving a witness's bias or prejudice, negating a
> contention of undue delay, or proving an effort to obstruct a
> criminal investigation or prosecution.

The defendant points to Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893-895

(2d. Cir. 1976), in which the Court held that a consent judgement between a federal agency and a

private corporation could not be used as evidence in a subsequent litigation between that

corporation and another party. (Docket No. 96 at page 3). The analysis in Lipsky focused on the

fact that the consent judgement, like a plea of nolo contendere, was not an adjudication of the

underlying issues in that case and could not be introduced for collateral estoppel purposes.

Lipsky, 551 F.2d. at 894.  Coleman appears to concede that she cannot introduce the Consent

Order and press release to "prove liability," but argues that Rule 408 allows admission of such

evidence "for another purpose." (Docket No. 103 at page 5). The plaintiff asserts that she offers

this evidence, not as proof of liability, but to rebut the City's contention that its Police

Department's policies and training have been accredited by the "DCJS" and the ("the Council")

and are therefore free from defect. (Docket No. 103 at page 5).  Coleman cites to U.S. Securities

and Exchange Commission v. Pentagon Capital Management PLC, 2010 WL 985205 (S.D.N.Y.

2010) in which the Court held that certain orders resolving proceedings commenced by the SEC

were admissible under Rule 803(8) as a "research, report, [or] statement ... of public offices or

agencies, setting forth ... factual findings resulting from an investigation made pursuant to

authority granted by law." Pentagon, 2010 WL 985205 at *2.  Here, the Court notes that the

Consent Order stipulates that the Attorney General had conducted an investigation into the

policies and practices of the Niagara Falls Police Department pursuant to §63(12) of the New

York State Executive Law.  As quoted above, the Consent Order finds that "documents indicate

that the NFPD has not implemented polices and procedures to adequately investigate and prevent

excessive use of force, including physical force, Taser instruments, and oleoresin capsicum spray

... and that some officers and supervisors failed to follow department protocols that did exist to

ensure proper police practice, including the use of force and citizen encounters and the filing of

reports on use of force to ensure proper practices and accountability." (Docket No. 103 at page

7).  The Court notes that the Consent Order is a publicly filed document from a state court

proceeding, executed by various state and local government officials in their official capacity,

relating to an official investigation by one public agency of another public agency.  The Court

finds that the Consent Order, but not the press release[11], would be admissible under Rule

---

[11] The plaintiff has not articulated a basis with respect to the admissibility of the press release.

803(8)(iii) as "a record or statement of a public office ... in a civil case ... [that includes] factual findings from a legally authorized investigation." The Court further finds that the Consent Order is not precluded by Rule 408 inasmuch as the plaintiff does not intend to offer the Consent Order to prove the liability of Niagara Falls, but to rebut the defendant's evidence that the accreditations of the DCJS and the Council demonstrate that the policies and training programs used by the Niagara Falls Police Department are adequate. Finally, the Consent Order is also not precluded from admission by Rule 403 of the Federal Rules of Evidence. The Second Circuit has recently reaffirmed that a "district court may exclude relevant evidence pursuant to Rule 403 only 'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" United States v. Dupree, 2013 WL 309983 at *5 (2nd Cir. 2013). Further, the Court stated that when weighing such a question, the court must consider the possible effectiveness of a jury instruction and the availability of other means of proof in making a Rule 403 determination." Dupree, 2013 WL 309983 at *5. The admission of the Consent Order would not cause confusion of the issues, mislead the jury, cause undue delay, waste time or needlessly present cumulative evidence. Although its admission would be prejudicial in the sense that it weighs against the City's arguments as to the adequacy of its policies and training programs, the Consent Order is not *unfairly* prejudicial in countering the argument that the accreditation of those programs by the DCJS and the Council suggests a lack of defect in those policies and programs. The language of the Consent Order is not inflammatory or hyperbolic. A limiting instruction can be fashioned and provided to the jury to address any potential improper inferences. As the Second Circuit emphasized in Dupree:

> we have noted that such dangers can often be cured by careful
> limiting instructions, *see, e.g.,* United States v. Mercado, 573 F.3d
> 138, 142 (2d Cir.2009)(affirming decision to admit potentially
> prejudicial evidence where the district court "gave several careful
> instructions to the jury regarding what inferences it could draw
> from the admitted evidence"); *see also* United States v. Snype, 441
> F.3d 119, 129 (2d Cir.2006)("[T]he law recognizes a strong
> presumption that juries follow limiting instructions.").

Dupree, 2013 WL 309983 at *5. The motion to strike is granted with respect to the press release,

but denied with respect to the Consent Order.

Upon this record, the Court must determine whether a material issue a fact exists as to

Coleman's Monell claim. Here, Redmond has acknowledged that he was not trained to use his

flashlight as a weapon (Docket No. 90-12 at page 73) and that the use of a non-authorized

impact weapon is only acceptable in emergency situations (Docket No. 90-12 at page 49). As

discussed above, a question of fact exists as to whether any use of force was required during the

underlying incident. The parties also proffer competing expert opinions as to the adequacy of the

City's policies regarding training, supervision and accountability. See Declaration of Michael

Levine for the plaintiff (Docket No. 90-25) and the Declaration of Mark S. Dunston for the

defendants (Docket No. 100). For example, Levine opines: "The totality of the materials

reviewed, as viewed through the lens of my 45 years of training and experience, particularly

citing my training and experience in the areas of Office of Professional Responsibility

Management Review, Internal Affairs Investigations, and Corruption Investigations, is strongly

evincive of a situation of substandard management oversight and review of enforcement

activities, and/or a law enforcement management situation that is enabling of systemic abuse of

police powers and instances of excessive use of force, and/or substandard training particularly in

use-of- force issues." (Docket No. 90-25 at ¶ 101). Conversely, upon his review of the Niagara

Falls Police Department's policy governing the use of force, the defendants' expert, Dunston,

concludes that the policy "is consistent with that which if found throughout the law enforcement

profession" and that the "policy in and of itself is reasonable and does not direct officers to act in

an unconstitutional manner." (Docket No. 100 at ¶ 6). In light of the competing expert opinions

and the other evidence in the record, questions of fact as to the adequacy of the policies regarding

training, supervision and accountability of the Niagara Falls Police Department with respect to

the use of force, both physical force and the use of pepper spray, in situations like that

encountered by Redmond on February 24, 2008, exist to preclude summary judgment as to this

claim.

In light of the above, the City's motion for summary judgment as to the plaintiff's <u>Monell</u>

claim should be DENIED.


**State Law Claims**

<u>Assault & Battery</u>

The plaintiff asserts New York state law claims of assault and battery against both

Redmond and Niagara Falls. To prove her state law civil battery claim, the plaintiff must show

that the officer made bodily contact, that the contact was offensive, and that the officer intended

to make the contact. <u>Laurie Marie M. v. Jeffrey T. M.</u>, 159 A.D.2d 52, 55, 559 N.Y.S.2d 336 (2d

Dep't 1990). In addition, a plaintiff asserting such a claim against a police officer is required to

prove that the officer's conduct was not reasonable within the meaning of the New York statute

concerning justification of law enforcement's use of force in the course of their duties. *See* N.Y.

Penal Law § 35.30(1); *see* Nimely v. City of New York, 414 F.3d 381, 391 (2nd Cir. 2005)(To prove his state law civil battery claim against the officer, the plaintiff was required to show that the officer made bodily contact, that the contact was offensive, and that the officer intended to make the contact. Additionally, the plaintiff was required to prove that the officer's conduct was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties.) citing Brunelle v. City of New York, 269 A.D.2d 347, 348, 702 N.Y.S.2d 648 (2d Dep't 2000)(The use of deadly force by the plaintiff's fellow officer was justified as a matter of law, as it is undisputed that the plaintiff police officer was struggling with a machine-gun-wielding suspect when a bullet fired by another officer struck the plaintiff in the hand.); Pelayo v. Port Authority, 2012 WL 4460798 (S.D.N.Y.,2012)(Similar to a claim for excessive force under § 1983, a state law claim for battery against a police officer in the course of an arrest requires the plaintiff to prove that the officer's use of force was excessive or objectively unreasonable under the circumstances.)

In light of the material factual issues relating to the plaintiff's excessive force claim, including whether Redmond reasonably believed any force was necessary during the incident on February 24, 2008, summary judgement is also precluded with respect to Coleman's assault and battery claims. Hattar v. Carelli, 2012 WL 246668, at *4 (S.D.N.Y.,2012)(Because the presence of material issues of facts on plaintiffs' excessive force claim precludes the summary judgment, the Court similarly denies summary judgment on plaintiffs' assault and battery claims.). These claims may also be asserted against the City of Niagara Falls, under the doctrine of *respondeat superior*, to the extent that they are found to have been committed by Redmond in his official capacity. Green v. City of New York, 465 F.3d 65, 86 (2nd Cir. 2006)(We therefore turn to the

Greens' assault and battery claims. A New York employer, such as the City, is liable for intentional torts, such as assault and battery, committed by its employees provided that the tort is committed within the scope of the plaintiff's employment.).

The respective motions for summary judgment with respect to the plaintiff's assault and battery claims should be DENIED.


Intentional Infliction of Emotional Distress

The state law tort of intentional infliction of emotional distress ("IIED") has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. See Howell v. New York Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993); Bender v. City of New York, 78 F.3d 787, 790 (2nd Cir. 1996). The conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Fischer v. Maloney, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978). Ordinarily, whether the challenged conduct is sufficiently outrageous will be determined as a matter of law. Doe v. Guthrie Clinic, Ltd., 2012 WL 531026, at * 8 (W.D.N.Y.,2012); Nevin v. Citibank, 107 F.Supp.2d 333, 345–46 (S.D.N.Y.2000) (citing Howell v. New York Post Company, Inc., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)).

Redmond contends that the plaintiff has failed to present medical evidence of "severe emotional distress" in this case.  (Docket No.  82-7 at page 17-18).  Redmond relies upon

Walentas v. Johnes, 257 A.D.2d 352, 353 (1st Dept. 1999) in which the court held that a plaintiff asserting an IIED claim "is required to establish that severe emotional distress was suffered ... which must be supported by medical evidence, not the mere recitation of speculative claims. See also Roche v. Claverack Co-op. Ins. Co., 59 A.D.3d 914, 918, 874 N.Y.S.2d 592, 597 (3d Dept.,2009)(Due to plaintiff's failure to present medical evidence of severe emotional distress, defendants were entitled to dismissal of plaintiff's speculative cause of action for intentional infliction of emotional distress).

The plaintiff responds that she has alleged that she was assaulted, battered and verbally harassed and that she has suffered both physical and mental injuries. (Docket No. 91 at page 27). In support of her claim of mental injuries, the plaintiff points to the allegations in the Amended Complaint (Docket No. 46 at ¶¶63-64); as well as her deposition testimony (Docket No. 90-2 at page 84, lines 9-23). Coleman does not allege that she suffered any psychological symptoms or conditions requiring medical treatment as a direct result of Redmond's conduct. The allegations in the Amended Complaint state, only in general terms, that the defendant's conduct was outrageous and shocking (Docket No. 46 at ¶ 63); and that the plaintiff was "greatly injured both physically and mentally and subjected to humiliation and embarrassment" (Docket No. 46 at ¶ 64). The portion of her deposition testimony proffered by Coleman only relates to the fact that she felt like she was going to have an asthma attack while sitting in the back of the patrol car and asked to have the window opened, to which Redmond allegedly responded that "white supremacists don't give you air." (Docket No. 90-2 at page 84). These general and unsubstantiated allegations are not sufficient, as a matter of law, to constitute the "severe emotional distress" required for an IIED claim under New York law. See Universal Calvary

Church v. City of New York, 2000 WL 1538019, 12 (S.D.N.Y.,2000) citing Anatsui v. Food Emporium, 2000 WL 1239068, at *7–8 (S.D.N.Y. 2000) (holding that derogatory comments and termination are "insufficient to constitute intentional infliction of emotional distress under New York law") and Muhlrad v. Mitchell, 1997 WL 182614, at *8 (S.D.N.Y. Apr. 14, 1997) (holding that allegations were insufficient to satisfy the element of outrageous conduct and noting "the New York Court of Appeals has never upheld a claim for intentional infliction of emotional distress"). Moreover, as to the municipal defendant, "public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity" Wyllie v. District Atty. of County of Kings, 2 A.D.3d 714, 720, (2d Dept. 2003) quoting Lauer v City of New York, 240 AD2d 543, 544 (2d Dept. 1997).

Based on the above, the respective motions for summary judgment as to Coleman's IIED claim should be GRANTED.

Negligent Infliction of Emotional Distress

The plaintiff brings a similar state law claim for negligent infliction of emotional distress ("NIED"). A claim for NIED also requires that a plaintiff demonstrate "severe emotional distress." See Fishman v. County of Nassau, 2011 WL 3919713, 11 (E.D.N.Y.,2011)("Under New York law, the torts of intentional and negligent infliction of emotional distress share three common elements: (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress."). For the reasons set forth above, the plaintiff's general and unsubstantiated allegations that she suffered a severe motional distress are insufficient, as a matter of law, to sustain a NIED claim against the defendants in this case.

29

The defendants respective motions for summary judgment as to Coleman's NIED claims should be GRANTED.

**Conclusion**

Based on the above, the defendants' respective motions for summary judgment should be granted in part and denied in part consistent with the above. Similarly, Niagara Falls' motion to strike should be granted in part and denied in part consistent with the above.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y.  Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

*/s/ Hugh B. Scott*
United States Magistrate Judge
Western District of New York

Buffalo, New York
February 20, 2013